[No. 29080. Department One. January 27, 1944.]

R. H. GILE *et al., Appellants,* v. FRED NIELSEN *et al.,*
*Respondents.*[1]

[1]Reported in 145 P. (2d) 288.

*Fred M. Bond,* for appellants.

JEFFERS, J.—This is an appeal by plaintiffs, R. H. Gile and wife, from a judgment entered on the verdict of a jury, after a motion for new trial had been made and denied. The judgment dismissed plaintiffs' action and awarded costs to defendants, Fred Nielsen and Anna Nielsen, his wife.

The allegations of the complaint as to the claimed negligence of defendants are as follows: That on October 26, 1941, at about ten o'clock in the forenoon, plaintiff R. H. Gile was driving his car on the Ocean Beach highway toward the city of South Bend, operating his car in a careful and reasonable manner, and approaching the intersection of Ocean Beach highway and highway No. 830; that defendants' car was approaching the intersection, and entered into the main highway at a high and dangerous rate of speed, at least forty-five miles per hour, which was unreasonable and improper under the circumstances, and in a reckless manner and without keeping a lookout for traffic and without stopping at the stop sign on highway No. 830.

Defendants by their answer denied all allegations of negligence on their part, and alleged affirmatively contributory negligence on the part of plaintiffs. By way of a cross-complaint, defendants alleged negligence on the part of

plaintiffs and damage to defendants' car as the proximate result thereof. Plaintiffs by their reply denied the affirmative matter set up in defendants' answer.

The following verdict was returned by the jury: "We the jury in the above entitled case find for the defendants."

By instruction No. 17½, three forms of verdict were submitted to the jury: (1) A verdict for plaintiffs, assessing the amount of their damages, if any; (2) a verdict for the defendants, assessing the amount of their damages, if any; and (3) a verdict for the defendants.

It is evident from the verdict returned that the jury found that plaintiffs were not entitled to recover, and that defendants were not entitled to recover on their cross-complaint. Defendants have not cross-appealed, and have filed no appearance in this court.

Appellants assign error in refusing to allow the witness Almon Church to testify that he had known Mr. Gile for some time, and had never seen him under the influence of liquor, and that Mr. Gile did not use liquor at all; in giving instructions Nos. 3, 9, and 14; in giving instructions Nos. 4, 6, 8, 10, 12, 15, and 17; in denying appellants' motion for new trial; and in entering judgment in favor of respondents, dismissing appellants' action and awarding respondents costs.

We shall hereinafter refer to Mr. Gile as though he were the only appellant.

There were introduced in evidence, without objection, among others, four exhibits. Appellant's exhibit D shows the intersection of primary state highway No. 830 with U. S. Highway No. 101, which is an arterial state highway, sometimes referred to as the Ocean Beach highway. This exhibit was prepared by Mr. Halvorsen, a civil engineer. Both of these highways are paved and have yellow stripes down the center. On highway No. 830, just before the intersection is reached, there is a stop sign at the side of the road, and also a stop sign printed on the pavement. Neither of these highways runs directly north and south or east and west. Highway No. 101 runs in a northeasterly direction, and highway No. 830 runs in a northwesterly direction,

where it joins highway No. 101. Highway No. 830 ·stops at highway No. 101. One driving up highway No. 830 and intending to go west on highway No. 101, toward Long Beach, is not required to make much of a turn to the left, because ·of the angle at which highway No. 830 intersects highway No. 101. There is a sharp curve to the right, or toward South Bend.

Exhibit A is one of three pictures taken by Dave Eveland, a photographer from Raymond, at the scene of the accident about ten minutes after the collision. It shows the intersection, some black spots on the pavement where the collision occurred, and appellant's car resting on its top on the edge of the pavement, headed back toward Long Beach, on the left-hand side of the highway for a car traveling toward South Bend, the direction in which appellant was going. The picture also shows highway No. 830 for some consider- ·able distance to the southeast of the intersection. According to the testimony of a deputy sheriff, appellant's car was one ·hundred twenty feet from where the collision occurred, and there were skid marks on the pavement and on the shoulders, indicating that appellant's car had slid on its top and was headed west, or in the direction from which it had come.

Exhibit B is a close-up of appellant's car, showing that it was damaged along the right side. The picture also shows trees and a large ferry sign on the right side of highway ·No. 101 as one approached the intersection from the west. (Gile was coming from the west.)

Exhibit C is a close-up of respondents' car. It does not show any injury to the radiator or hood, but only to the right front fender and wheel, and possibly to the right front door. At the time this picture was taken, respondents' car was standing off the pavement on highway No. 830 just east of the intersection, where, according to the testimony of Mr. Nielsen, it had been driven by him after the accident.

There is some conflict in the testimony as to just where the collision took place, that is, whether actually in the intersection or immediately to the west of it.

Rem. Rev. Stat., Vol. 7A, § 6360-1 [P. C.. § 2696-767], subd. (u), defines "intersection area" as follows:

"The area embraced within the prolongation of the lateral curb lines, or, if there be no curbs, then the lateral roadway boundary lines, of two or more public highways which join one another at an angle, *whether or not such highways cross one another.*" (Italics ours.)

To the left or west of the intersection, there is a curve in highway No. 101 which obscures the view of the intersection; that is, one coming from the west, the direction from which Mr. Gile was coming, cannot see the intersection until he gets around this curve. From the testimony it is not clear how much the trees and the ferry sign to the right of highway No. 101, as one comes from the west, shut off the view of highway No. 830 to the east of the intersection, the direction from which respondents were coming.

It is impossible to tell from the exhibits just what area is included in the intersection, because of the way in which the highways join, and because there is no definite indication of the lateral roadway boundary lines.

The testimony of Mrs. Nielsen, who was driving respondents' car at the time of the accident, is to the effect that respondents, accompanied by Mr. and Mrs. Vincent, left their home near Skomakawa that morning, intending to go to Long Beach. Mrs. Vincent was riding in the front seat with Mrs. Nielsen, and the two men were in the back seat. As Mrs. Nielsen, proceeding northwesterly on highway No. 830, approached the intersection, she stopped at the stop sign on the pavement, looked up highway No. 101 to the right toward South Bend and then to the left toward Long Beach, and, seeing no cars, started toward the intersection. As she got into the intersection, she saw a car on highway No. 101 in the curve to the west, but she kept on going across the intersection, and before she knew it, appellant's car was right on them. At the time of the impact she had crossed the intersection and was on the right-hand side of the yellow line on highway No. 101, and judged she had traveled about one hundred feet from the point where she

had stopped before entering the intersection. It further appears from her testimony that just before the impact she attempted to swing her car to the left, but the Gile car struck her car on the right-hand side. After the impact, respondents' car continued on down the road about six or seven hundred feet. Mrs. Nielsen tried to stop it, but her foot brake was broken and would not work. She finally stopped the car with the emergency brake.

Mrs. Vincent testified that Mrs. Nielsen, before going onto highway No. 101, stopped at the stop sign on the pavement; that the witness had formerly driven a car, and she watched the road; that, when Mrs. Nielsen stopped, Mrs. Vincent looked down highway No. 101 toward the beach, and there was no traffic approaching. We quote from Mrs. Vincent's testimony:

"Q. About how far had she [Mrs. Nielsen] traveled, that is—after that did you see this Gile car after she started up to the intersection again? A. I did not see it in the intersection I saw it when we were up in the road. Q. Just describe as it came around there? A. It came around the curve and it went away over to the other side towards the river, towards the slough. Q. That would be to his right? A. Yes, so that I could not say it was off the pavement but I did see he was away off as if he was going to stop. He came lickety split. I could not say he went so many miles an hour because I don't know, I cannot judge that, but he did come at a terrific speed. He went clear around on the grassy part, the gravel side of there, and then he swung over and hit us a glancing blow; he didn't come head on. Q. Where were you in relation to the road, the left side of the road at that time? A. We were over on our side of the line. Q. After the impact—which side of your car did he pass on, right or— A. The side I was sitting on."

Mrs. Vincent further testified that their motor was still running after the impact, and Mrs. Nielsen turned off the ignition, applied the emergency brake, and stopped the car.

Mr. Nielsen also testified that his wife stopped before going into the intersection, but that as he was in the back seat he did not look to see if any traffic was approaching on highway No. 101.

Mr. Gile's testimony was to the effect that he was traveling toward South Bend on highway No. 101. He first saw respondents' car as he came around the curve hereinbefore referred to, which is about six or seven hundred feet southwest of the intersection. At that time respondents' car was just coming off the bridge on highway No. 830, about seven hundred feet from the intersection. We quote from Mr. Gile's testimony:

"Q. You watched them [respondents] come right on up did you? A. No sir there was a car coming down the hill from towards South Bend, I saw their car was coming rather fast— Q. You saw it at the bridge, is that the last time you saw it? A. Until after the impact, yes. Q. In other words you never saw the car again until after the impact? A. After I looked up the hill to see this car coming down the hill, I looked back to see where the Nielsen car was and it was right on top, I would say 15 feet from me. Q. As you came around the curve the Nielsen car was just coming off the bridge and that is about 700 feet away from the intersection? A. When I noticed the car, 700 feet. Q. When you next saw the car it was 15 feet away from you? A. That is right. Q. All you had done in the intervening time was to look ahead of you and looked back again? A. Practically yes, I figured the car would stop."

After the impact, the Gile car traveled about fifteen or twenty feet, and turned over, facing back the way it had come, and then slid about one hundred feet on its top. Mr. Gile testified he was traveling about fifty miles an hour as he came around the curve, then slowed down to about forty-five miles, and was traveling about forty miles an hour at the time of the collision. He further testified that it first occurred to him that respondents were not going to stop when he was fifteen feet from them, and at that time he tried to swerve his car to the left.

From the exhibits and testimony, there seems to be no question but that the collision actually took place in the right-hand lane of highway No. 101, going west, which would be the wrong side of the road for the Gile car, going in the opposite direction.

Jess Darling, who was driving a car approaching the intersection from South Bend, and a Mr. Chase, who was riding with him, both testified on direct examination that respondents' car did not stop before going into the intersection, but Mr. Darling, on cross-examination, finally admitted that he did not watch or see either the Gile car or respondents' car from the time they were about one hundred fifty feet from the intersection until after the impact, as he was trying to stop his own car and avoid a collision with the Gile car, which had started to swerve to his side of the road. Both of these witnesses testified respondents' car was traveling between fifty and sixty miles an hour. Mr. Darling thought the Gile car started to swerve when it was about two hundred feet from the intersection; Mr. Chase when it was about seventy-five feet from the intersection.

 The first assignment of error pertains to the refusal of the court to allow the witness Almon Church to answer a question propounded by counsel for appellant. This matter came up in the following manner: Mr. Coyle, deputy sheriff of Pacific county, had testified that when he arrived at the scene of the accident Mr. Gile was not there, and neither the Nielsens nor anyone there knew to whom the Gile car belonged, nor the name of the man who had been driving it; that he made an examination of the car, and found in it some empty beer bottles and one full stubby. On cross-examination, Mr. Gile was asked:

"Q. There was quite a bunch of beer bottles fell out of your car? A. Yes. Q. How many? A. I don't know exactly. Q. Do you know how many you had in the car? A. The bottles in there, I took them up to take into town. Q. These were all empties? A. Yes sir all but one. Q. How many of them, had you some that morning; how many had you consumed that morning? A. None. Q. Did you have one full one? A. Yes. Q. Were you taking that back to town too? A. No I was not."

The above testimony was in the case at the time Mr. Church was called. He testified he had known Mr. Gile for about a year, continuing:

"Q. Did you ever see him [Gile] under the influence of intoxicating liquor? A. Never did. Q. As far as you know does he use it at all?"

At this point, objection was made by Mr. Moore, attorney for respondents, which objection the court sustained, and it is of this that appellant complains, arguing that it was intimated by the testimony brought out by respondents that Mr. Gile might have been drunk. This line of testimony was not pursued further, and it does not appear that anyone testified that Mr. Gile was drunk or appeared to be under the influence of liquor. Mr. Bond admitted that no one had attacked Mr. Gile's sobriety. The trial court, as shown by the record, did not foreclose Mr. Bond from further pursuing this subject in a proper way and by proper questions, but was apparently of the opinion the question asked was not a proper one. Mr. Bond did not ask any further questions pertaining to this matter. We are of the opinion the trial court did not err in sustaining an objection to the question asked.

 It is next contended the court erred in giving instructions Nos. 3, 9, and 14. Appellant states in his brief that the court erred in giving instruction No. 3, for two reasons:

"1. Because said instruction placed the same burden upon the plaintiff as upon the defendant. That said instruction should have included rules laid down by this court to the effect that the primary duty rested upon the disfavored driver, that is upon the defendant in this action.

"2. Because under the admitted facts in the case the defendants were guilty of negligence as a matter of law for the reason that the defendants had a clear and unobstructed view as admitted by their evidence and that the plaintiffs' car was in plain sight and they were negligent in failing to see it."

It is further stated that the court erred in giving instructions Nos. 9 and 14, for the same reasons as mentioned in connection with instruction No. 3.

The following exceptions were taken by Mr. Bond to instruction No. 3:

"First: because it limits the speed to 35 miles an hour at this particular place, the scene of the accident when the law gives him 50 miles an hour.

"Second: that it is assumed that at this intersection there are two highways transversing each other as mentioned in the statute, limiting the speed to thirty-five miles an hour. The exception is that under the circumstances in this case there are not two highways transversing each other and therefore the 35 miles does not apply.

"Third: that there is no intersection of the highway here involved as referred to in the statute as to intersection."

In view of the conclusion we have reached, relative to instruction No. 3, we do not deem it necessary to set out the instruction.

It is apparent that, at the time the exceptions to instruction No. 3 were taken, appellant was of the opinion that, under the statute, there was no intersection created by the junction of these two highways. The basis of the exceptions is rested entirely on the above premises. No other objection is made or pointed out in the exceptions to this instruction.

We are satisfied that under Rem. Rev. Stat., Vol. 7A, § 6360-1, subd. (u), hereinbefore set out, the junction of these two highways did create an intersection.

Counsel now, however, is apparently of the opinion that this was an intersection case, and now contends that the court erred in giving the instruction, for reasons entirely different from those contained in his exceptions, citing cases involving intersection accidents such as *Martin v. Hadenfeldt,* 157 Wash. 563, 289 Pac. 533, and *Billingsley v. Rovig-Temple Co.,* 16 Wn. (2d) 202, 133 P. (2d) 265.

Rem. Rev. Stat. (Sup.), § 308-10 [P. C. § 8676-13], Rule X, Rules of Practice, provides:

"Exceptions to a charge to a jury, or to a refusal to give as a part of the charge instructions requested in writing, may be taken in the absence of the jury by any party at the conclusion of the charge and before reception of the verdict. Such exceptions may be either oral or in writing, and shall be noted by the court, and shall specify the paragraphs or particular parts of the charge excepted to, and the requested

instructions the refusal to give which is excepted to, *and shall be sufficiently specific to apprise the judge of the points of law or questions of fact in dispute."* (Italics ours.)

The evident purpose of the above rule is to advise the court specifically of the reasons for a claimed error. It is evident to us that the trial court could not, by the exceptions taken to instruction No. 3, have been advised of the reasons appellant now assigns for the claimed error, and we are therefore of the opinion that the exceptions were insufficient to permit appellant to raise, or this court to consider, the error for the reasons now assigned and argued. See *State v. Eckert,* 173 Wash. 93, 21 P. (2d) 1035.

■ We are of the opinion that the trial court, under the facts in this case, would not have been justified in instructing the jury that respondents were guilty of negligence as a matter of law.

It should be kept in mind that appellant proposed no instructions in this case.

■■ In regard to instructions Nos. 9 and 14, the record is as follows: Upon page 214½ of the statement of facts, which is the last page preceding the judge's certificate, appears the following:

"Plaintiff and defendant both approved of and consented to give the following instructions:
"4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 17, as disclosed by defendants proposed instructions:
"2, 3, 20, 7, 8, 9, 10, 11, 14, 15, 19, 21, and 25."

The following appears as part of the judge's certificate:

"That the matters and proceedings embodied in the foregoing statement of facts are matters and proceedings occurring in said cause on the hearing set forth therein, and the same are hereby made a part of the record herein;
"I further certify that the same contains all the material facts matters and proceedings heretofore occurring in said trial and not already made a part of the record herein . . . .
"That at the conclusion of the testimony the court with the court reporter and counsel for the plaintiff and defendant repaired to the chambers and there the instructions proposed by defendant were examined by the court and by both

counsel, and as examined, when both counsel agreed that the individual instruction was satisfactory, the court reporter, in the presence of counsel and the court, indicated on defendants' proposed instruction that they were satisfactory by marking on each such instruction the letters 'OK', as appears on defendants' proposed instructions, and such instructions were given by the court; and that thereafter the court reporter, at the request of the court, from the notes made by him on such instructions prepared page 214½ of this statement of facts."

Beginning on page 200 of the statement of facts, up to and including page 214, appear respondents' proposed instructions. On proposed instruction No. 11 appear the letters "OK". This proposed instruction is the same as instruction No. 9 as given by the trial court, upon which error is based. On proposed instruction No. 14 appear the letters "OK". This is the same as instruction No. 14 as given by the court, upon which error is based.

While as we have stated, respondents have made no appearance in this court, appellant has filed what he terms a reply brief. This reply brief, so-called, is typewritten, and does not go to the errors claimed to have been committed by the trial court, but attempts to question, and is concerned entirely with questioning, the facts stated on page 214½ of the statement of facts and the right of the court to include in its certificate the statement relative to making page 214½.

We cannot consider the contentions made by appellant in this reply brief. In the first place, it is not a reply brief in any sense of the word; in the second place, it does not comply with the statutes and rules of this court relative to briefs being printed; and, in the third place, appellant may not question the certificate of the trial court by a mere statement in his brief. It may be admitted that this certificate is somewhat unusual, but, if it be conceded that the trial court has included improper matter in the statement of facts or its certificate, appellant had a remedy by which the contention he now makes could have been brought before this

court. Such contention cannot, however, be raised by a so-called reply brief.

Appellant also bases error on the giving of instructions Nos. 4, 6, 7, 10, 12, 15, and 17. It will be noticed that it is not contended that these instructions are wrong, but it is contended that they all unduly emphasize that the burden of proof is upon appellant, and that they are unduly favorable to respondents and unfavorable to appellant.

It may be admitted that the instructions above named do stress the burden which is cast upon appellant, and might have been couched in a little different language, but instructions Nos. 4, 6, 8, 10, 12, and 15, as given, are the same as instructions Nos. 2, 4, 6, 8, 10, and 21, as proposed by respondents, upon each of which appear the letters "OK". For the reasons heretofore assigned in discussing instructions Nos. 9 and 14, we cannot consider the contentions made as to the instructions above enumerated. Neither is the error assigned to the giving of instruction No. 17 of merit.

While respondents did not recover on their cross-complaint, they were the prevailing party in the court below, as appellant was denied recovery against them. As such prevailing party, therefore, respondents, under Rem. Rev. Stat., § 476 [P. C. § 7457], were entitled to costs.

For the reasons herein assigned, we are of the opinion the trial court properly denied the motion for new trial and entered judgment on the verdict.

The judgment of the trial court is affirmed.

SIMPSON, C. J., BEALS, BLAKE, and GRADY, JJ., concur.